## THOMAS SPEAKMAN v. GIDEON JAQUES.

Court of Chancery. New Castle. In Vacation. September 5, 1827.

*Ridgely's Notebook V, 362.*

*James Booth, Jr.,* for petitioner.

The affidavit states that in December, 1819, the farm of the petitioner, near the town of New Castle, was advertised by John

Moody, then Sheriff, to be sold on the thirteenth of said month in said year, on execution process at the suit of James McCullough, farmer, returnable to December Term of the Court of Common Pleas in said year. That said land was worth more than the liens against it, but petitioner could not command money sufficient to prevent the sale.

That Gideon Jaques of Wilmington, Practitioner of Physick, a professed friend of petitioner, represented to petitioner, that if he, Jaques, could appear at the sale as a judgment creditor of petitioner, he could manage so as to save said land for petitioner and obtain further time for him to discharge the execution under which it was then advertised to be sold, and also to make an arrangement with the other judgment creditors. That therefore petitioner made his bond to said Gideon Jaques on December 10 in said year (1819), dated same day and year, conditioned to pay $2,143.00 with interest to said Gideon Jaques on or before the next day after the date of said bond, that is, December 11, 1819. That on a warrant of attorney annexed to said bond, judgment was entered on said December 10, 1819, in the Court of Common Pleas at New Castle. And petitioner avers and says, that at the time of making said bond, he did not owe said $2,143.00 to said Jaques; but he admits that [he] owed to him upwards ([*Quaere.*] How much above?) of $500.00 and not exceeding $600.00. That on said December 13, the first day of December Term, 1819, of the Court of Common Pleas, said land was exposed to public sale, and was struck off to said Gideon Jaques for $10,280.00, he being the highest bidder.

That [the] sheriff returned on said execution process said Gideon Jaques as the purchaser for said sum; that Jaques did not appear at said term, nor pay said purchase money, nor any part of it, nor comply with the conditions of sale, and application was made by said McCullough's attorney for leave to sheriff to amend his return, that said land was not sold for want of a purchaser. Leave was granted, and said return was so amended, as by office copy marked *C*. That an arrangement was made with the judgment creditors of petitioner whereby he remains in possession of said land.

That petitioner urged Jaques to a settlement that satisfaction might be entered on Jaques' judgment against him, which Jaques evaded from time to time, until April 20, 1821, when Jaques and petitioner settled; and Jaques agreed on petitioner's executing to him a bond to pay $741.36 with interest from said date, which was upwards of $100.00 more than petitioner owed him, that Jaques would cause satisfaction to be entered on said judgment. That on the day and year last aforesaid (April 20, 1821) petition-

er executed a bond to Jaques with warrant of attorney conditioned to pay $741.36 with interest from the date. And thereupon Jaques wrote a direction, on the back of the first mentioned bond, to the prothonotary, to enter satisfaction upon the record of said judgment which was accordingly so done, as appears by said office copy annexed marked *A*.

That on July 24, 1821, petitioner paid in cash to said Jaques in part payment of the last mentioned bond (for $741.36), $200.00; that said Jaques had promised petitioner when they came to a final settlement he would not exact of petitioner more than what was actually due to him Jaques, though the bond was for a larger sum than was owing to him by petitioner. ([Note.] Yet on third page of the affidavit, petitioner says he frequently urged Jaques to a settlement that satisfaction might be entered in the record of said judgment against him for, I suppose, $2,143.00 and that on April 20, 1821, he and Jaques settled, and he gave Jaques a bond on $741.36; which was upwards of $100.00 more than he owed Jaques).

That on August 22, 1826, petitioner and Jaques came to a settlement in respect of said bond. ([*Quaere.*] For $741.36?), and it was agreed that an account which petitioner had against said Jaques for pasturing his horses and keeping them winter and summer ([*Quaere.*] How many? Where? When? And for what length of time?) should stand good against the interest upon said bond; and finally to close the said bond, it was agreed that petitioner should give his note payable in ninety days to Jaques for $541.36, the balance of principal due at that time upon said bond; and that when the note should be paid, the said bond was to be considered as satisfied; that the note was given to enable said Jaques to receive the balance due upon said bond by having said note discounted at the Bank of Wilmington and Brandywine. That upon petitioner's making his note for said sum ($541.36), Jaques gave to him his receipt dated, Wilmington, August 22, 1826, in which Jaques acknowledged to have received of petitioner his note for $541.36, of said date, expressing said sum to be the principal due upon said bond, and that when said note was paid, it would stand for that much against said bond, as by the receipt exhibited herewith.

That said note, being indorsed by Jaques, was immediately discounted at the Bank of Wilmington and Brandywine, and petitioner paid to Jaques the discount; this discount and the sum received of the Bank were equal to $541.36, the balance due on said bond, which petitioner avers went into the hands of Jaques. That when said note fell due it was satisfied by a new note at ninety days given by petitioner with Jaques, indorser, the dis-

count being paid by petitioner. And petitioner believes and so insists, that when the said first note was satisfied as aforesaid the said bond was in law paid. That said Jaques no longer had any remedy against petitioner upon said bond and that this affirmant could in no manner be made liable to pay to Jaques said $541.36, except as drawer of said last mentioned note, in case said Jaques was obliged to pay the same to said Bank as indorser upon the neglect or refusal of petitioner to pay the same as drawer. And petitioner says that by agreement of him and Jaques the said last note was renewed by another, and so on successively until May 21 last past (1827), petitioner always paying the discount, at which time, a note drawn by petitioner and indorsed by Jaques for $541.36 was put into said Bank, with the understanding that, when due, it should not be renewed but paid off by petitioner. That petitioner was prepared to collect funds to pay said note, when Jaques caused judgment to be entered upon said last mentioned bond, without intimation to petitioner of his intention so to do. Said judgment was entered in Common Pleas July 14, 1827, and *fieri facias* issued for the whole amount of real debt and interest of said bond, after deducting the said credit of $200.00, as by copy *B* annexed.

That first information etc. Remonstrated with Jaques who stated, if petitioner would discharge the last mentioned note at the Bank, he Jaques would enter satisfaction upon the judgment, countermand *fieri facias,* and pay all costs. Petitioner went to the Bank to pay the note though it would not be due for twenty days, and found the note was not there, but had been delivered to Jaques one or two days preceding. Petitioner informed that just before Jaques entered judgment on the bond he offered to assign it to Thomas Janvier without any credit than the $200.00.

That on August 22, 1827, the day when he supposed the last said note was due, he went to Wilmington to tender at the Bank to the cashier the $541.36 and obtaining the note. Cashier stated that he could not deliver it, as it was in possession of Jaques. Cashier admitted he had delivered to Jaques the three preceding notes drawn by petitioner including that of August 22, 1826, and though the same were discharged, yet the cashier delivered them to said Jaques without the usual mark put at that bank upon all notes and checks which had been paid. Petitioner called on Jaques and tendered to him $541.36 and demanded the notes. Jaques refused to receive the money, or to deliver the notes. Referred petitioner to his (Jaques') counsel. Both went to the counsel. Petitioner [tendered] to Jaques and his counsel said $541.36. They refused to receive the same or to deliver the [notes] unless petitioner would deliver up the receipt of August

22, 1826, which petitioner refused to do. Petitioner again tendered said money and demanded the notes. And finally said $541.36 were accepted by Jaques in the presence of his counsel, and said notes were delivered up.

Soon after, sheriff informed petitioner that Jaques had caused said $541.36 to be entered as a credit on said judgment as of August 22, 1827, as by copy *B*, and had directed sheriff to sell the property of petitioner under the *fieri facias,* and make $200.00 and upwards the amount of interest which Jaques claims as due upon said bond and judgment and execution issued thereon.

Prayer. Upon the facts stated in the foregoing affidavit Thomas Speakman therein named prays the Chancellor to grant the writ of injunction to restrain the said Gideon Jaques, his counsellors, attorneys, solicitors and agents, and Peter P. Delany, Esq., Sheriff of New Castle County, and every of them from all further proceedings at law against him the said Thomas Speakman touching any of the matters set forth in the said affidavit, particularly all further proceedings upon the judgment and execution therein mentioned until the Chancellor shall make other order to the contrary.

———

The following is so much of a letter addressed to *James Booth, Jr., Esq.,* counsel of Thomas Speakman, as relates to this subject. The letter is dated September 6, 1827, and was put in the Post Office at Dover the 7th September aforesaid:

The controversy between Thomas Speakman and Gideon Jaques turns now, I presume, on a question of interest. There are placed on the record, to the credit of Thomas Speakman, two sums which amount to $741; leaving of principal thirty-six cents only. The latter of these sums was entered on the 22nd August, 1827, after the *fieri facias* had been issued; but in the face of this record this last mentioned sum of money cannot be attempted to be levied. And in page ten of the affidavit it is stated that Gideon Jaques has directed the sheriff to levy $200 and upwards, the interest only, upon the *fieri facias*. According to my calculation I make the interest due on the 22nd August, 1826, when Jaques received the $541.36 on the note at the Bank to be about $180.08½. And, I suppose, he claims further interest to the 22nd August, 1827, when the last money was paid to him by Speakman.

Now, as to the question of interest, according to the statement in the affidavit. The first transaction seems to have originated in fraud, for I collect from the affidavit that it

was designed to operate against *bona fide* creditors, and without any such money as $2143 being due to Gideon Jaques. On the 10th December, 1819, when Speakman made his bond to Jaques for $2143, to be paid the next day with interest, he says that he did not owe that money to him, but that he owed him upwards of five and not exceeding six hundred dollars. And this seems to be verified by satisfaction being entered on the judgment for said real debt of $2143, on the day of the date of the bond for $741.36 real debt. On the 20th April, 1821, Speakman says that he and Jaques came to a settlement, and he executed a bond for $741.36, with interest from the date, but which was upwards of one hundred dollars more than Speakman owed Jaques. As a settlement was made, it is strange that the bond should exceed the amount due, and particularly that that allegation should be made without showing the settlement and pointing out the error or mistake.

Well, on the 24th July, 1821, he paid to Jaques in cash, in part of the bond, $200, and then Jaques promised not to exact more than what was due when they should come to a final settlement. And on the 22nd August, 1826, they came to a final settlement in respect of the said bond, and it was agreed that Speakman's account against Jaques for pasturing and keeping horses should stand good against the interest due upon the said bond. Where is this account which was to stand good against the interest, after a settlement made? What number of horses were pastured and kept, and when and where, and for how long a time? If this account is relied on as a set-off against the interest, why was it not stated and exhibited with all the items or charges and dates particularly specified and sworn to?

And finally to close the bond the note was agreed upon and drawn; and the petitioner says that when the note should be paid, the bond was to be considered as satisfied. Jaques gave his receipt for the note, dated the same day, the 22nd August, 1826, and therein declared the said sum, $541.36 to be the principal due on said bond, and that when paid, it should stand for that much against the bond. This receipt given by one, and received by the other, seems to admit that the $541.36 would not discharge the bond, but the principal only; and it implies that there existed some question about the interest. The money, according to the affidavit (the note being then discounted by the Wilmington and Brandywine Bank) went immediately into the hands of Doctor Jaques; and thereupon, the petitioner alleges that

the bond was, in law, paid and discharged. I do not perceive, though, that the note and money received on it settled the question of interest; for the receipt says that $541.-36 was the principal due on said bond, and that when paid it should stand for that much against the bond.

The other matters mentioned in the affidavit do not throw any light upon the question of interest. They arose subsequently, on the transactions in relation to the other notes. Though Dr. Jaques had not been discharged from all responsibility on the notes, a court of equity would hardly interpose, or at least would not restrain him, without protecting him from any risk on account of the notes of which he was indorser.

As to the prayer or petition. A Court of Chancery will not order a writ of injunction unless it is prayed for; nor to restrain any proceedings at law, unless they are specially stated and referred to in the prayer for the writ of injunction. I understand, when a writ of injunction is asked for, "to restrain the plaintiff at law from proceeding upon the judgment and execution therein mentioned," for they are fully set forth in the affidavit, and in the annexed schedule, and are sufficiently identified; but what is meant by "any of the matters set forth in the affidavit," I have not wit enough to find out. If there are any other matters than the judgment and execution to which you wish the injunction to be applied, please to refer to them, and I will consider them. Such generality troubles and perplexes me without advantage to the party.

Be pleased to permit Doctor Jaques' counsel to read the above part of this letter, and take a copy if he chooses.

[ (Signed) *Nicholas Ridgely, Chancellor.*]

---

NOTE (made September 11, 1827).

Proper injunction cannot be granted unless expressly prayed by the bill. Amb. 70. Mr. Booth, in a letter of the 10th September, 1827, says that the Chancellor, in his letter to him, of which the above is a rough draft (or was intended to be so) in the language quoted, to wit, "any of the other matters set forth in the said affidavit," made a mistake. The word "other" was not used in the affidavit; but that the petition prays that the plaintiff at law may be restrained "from all further proceedings touching any of the matters set forth in the said affidavit," and then immediately follows, "particularly by the judgment and ex-

ecution therein mentioned." And then he says that the forms in New Castle will sustain him in the words used in this petition or prayer, the word "other" not being in it. And he refers to Bar. Eq. 41, that in the form of the prayer for an injunction similar language is used as is contained in the prayer of Speakman, *viz,* "touching the matters aforesaid." Also in the form of the writ, [Bar. Eq.]48, 49, there is the same generality of expression made use of, *viz* "touching any of the matters in the said bill complained of."

It does not seem to the Chancellor that the addition or omission of the word "other" makes any difference in the matter objected to by the Chancellor. The prayer of the petition is that Gideon Jaques may be restrained from all further proceedings at law "touching any of the matters set forth in the said affidavit, particularly all further proceedings upon the judgment and execution therein mentioned, until," etc. Now here there is a reference to other matters beside the judgment and execution. A statement is made of notes drawn by Speakman, indorsed by Jaques, and of money paid by Jaques to the Bank on one of the notes; that all of them had been delivered by the Bank to Jaques, without the usual mark which indicated their payment; and then that money had been tendered by Speakman to Jaques, and refused to be accepted by Jaques; and finally that Jaques had accepted the money, and had delivered the notes to Speakman. Though it seemed improbable that Jaques would or could proceed at law against Speakman upon any of these matters, yet the Chancellor could not know what right of action Jaques might suppose had accrued to him out of these matters, or that Speakman did not contemplate some action to be brought against him by Jaques upon some of these matters. He prayed for a writ of injunction touching any of them, and certainly comprehended in the prayer some other matter than the judgment and execution. This arose out of the "facts stated" and the matters set forth in the said affidavit, beside those particularly relating to the judgment and affidavit. The Chancellor could not perceive the distinct view Speakman or his counsel had taken of the case, though he supposed no ground was laid for a writ of injunction against any matter growing out of the facts stated and set forth in the affidavit, other than the judgment and execution. Still he was uncertain, and therefore made the remarks in his letter to Mr. Booth.

The Chancellor has not Barton's Equity before him; and it is probable that the form in New Castle County, and in all the counties will sustain Mr. Speakman's counsel; but those forms which have passed without notice, and in which there was cer-

tainty enough to understand the application, do not constitute the practice or law of the court. Mitf.Pl. 46, Coop.Eq.Pl. 13; where a bill seeks to obtain the special order of the court, or a provisional writ, as injunction *ne exeat regno,* or other writs of a similar nature, it is usual to insert in it, immediately after the prayer of process, a prayer for the order or particular writ which the case requires. Blake Ch.Pr. 407, the form of a writ of injunction in the State of New York, where it restrains the plaintiff at law from proceeding "upon the judgment in favour of E. F. mentioned in the said bill," etc. 2 Harr.Ch.Pr. 206, writ of injunction to "desist from all further proceedings at law against the said complainant touching any of the matters in the said bill complained of, until" etc. Here it is general. 2 Harr.Ch.Pr. 208, writ of injunction, special.

Another reason for particularity is that in England injunctions are commonly ordered on motion, and then the whole case is discussed; here it is commonly done, *ex parte,* on affidavit, or on bill filed, and therefore there should be great precision in the prayer; especially as, on an injunction to stay proceedings at law, on a judgment by which money is recovered, security is ordered.